**DENTONS US LLP**
D. Farrington Yates
Marc H. Mandel
James A. Copeland
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

*Counsel for the Petitioner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| COGENT FIBRE INC., | Case No. 15-_____ (___) |
| Debtor in a Foreign Proceeding. | Recognition Request Pending |

**DECLARATION OF PETITIONER IN SUPPORT OF (I) VERIFIED PETITION
FOR RECOGNITION OF CANADIAN PROCEEDING UNDER CHAPTER 15 AND
MOTION FOR ORDER GRANTING RELATED RELIEF AND (II) MOTION FOR
(I) *EX PARTE* EMERGENCY RELIEF AND (II) PROVISIONAL RELIEF
PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE**

I, Robert M. Mantrop, in my capacity as a Director of the Petitioner. pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am a Director of Cogent Fibre Inc.[1] ("CFI" or the "Debtor"). CFI was duly authorized to act as its own foreign representative for purposes of the Canadian Proceeding and this chapter 15 case (in such capacity, the "Petitioner"). I am over the age of 18, a citizen of Canada, and, if called upon, could testify to all matters set forth in this declaration, except as otherwise provided herein.

---

[1] "Fibre" is the Standard Canadian English spelling for "fiber," and as such, is used by CFI in its name, marketing materials, and third-party communications.

2. In 1996, I received a Bachelor of Arts in Environmental Science from Hobart and William Smith Colleges in Geneva, New York. I spent two years playing professional hockey in Europe, and five years as an environmental consultant (focusing on biomass and renewable fuels). In 2005, I co-founded CFI and have served as one of its director-managers for the past ten years.

3. Matters stated in this declaration that are statements of fact and that are based upon my personal knowledge are true and correct. Matters stated in this declaration that are statements of fact and that are not based upon my personal knowledge but that are derived from the CFI's business records, other documents or information that became available before or in connection with CFI's insolvency proceedings are true to the best of my information and belief.

4. The Petitioner hereby submits this declaration in support of the (i) *Verified Petition for Recognition of Canadian Proceeding Under Chapter 15 and Motion for Order Granting Related Relief* (the "<u>Verified Petition</u>") and (ii) *Motion for (I) <u>Ex Parte</u> Emergency Relief and (II) Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "<u>Stay Motion</u>").[2]

A. **CFI's Business, Corporate Structure, and Debt Structure**

5. <u>CFI's Business</u>. Established in 2005, CFI and its predecessor entities marketed and exported pine woodchips from the eastern coast of the United States. CFI's clients use woodchips to, among other things, manufacture particleboard and medium-density fiberboard as well as to generate clean, renewable energy at biomass-fired power plants. CFI's procurement policy practices were *SFI (Sustainable Forestry Initiative) Certified* as its woodchips were produced from the necessary tree-thinning of certain private timberlands in the southeastern U.S.

---

[2] Capitalized words not otherwise defined herein shall have the meaning set forth in the Verified Petition.

Between 2005 and 2014, CFI exported more than four million metric tons of pine woodchips and was once the leading woodchip exporter on North America's eastern coast with clients in Austria, Italy, Turkey, and China.

6. CFI was the exclusive woodchip exporter for two of the three active woodchip terminals in the eastern U.S.: the East Coast Terminals in Savannah, Georgia (the "Savannah Terminal") and The Port of Morehead City in Morehead City, North Carolina (the "Morehead Terminal" together with the Savannah Terminal, the "Export Terminals"). In addition to the Export Terminals, CFI indirectly sourced woodchips from an exclusive supplier out of South America through the Orinoco Wood Chips C.A. Edificio (a loading dock and storage facility) located on the Orinoco River in Punta de Piedra, Venezuela. However, CFI has since ended its relationship with its exclusive Venezuelan source.

7. In or about May 2008, CFI entered into a five-year charter party contract (as amended, the "NSU Charter Party") with NS United Kaiun Kaisha, Ltd., a Japanese company ("NSU"), for the exclusive use of the maritime vessel the "Daishin Maru." On October 25, 2007, CFI entered into a seven-year charter party contract (as amended, the "NYK Charter Party") with Nippon Yusen Kaisha, Tokyo, a Japanese company ("NYK"), for the exclusive use of a maritime vessel "TBN" or "to be named" (together with the Daishin Maru, the "Vessels"). The Vessels were custom-designed and engineered for the transportation of woodchips and woodchip pellets, which allowed CFI to maximize the economics of shipping woodchips. And as a result, until in or about December 2012, CFI enjoyed a substantial competitive advantage as the only woodchip exporter with two long-term woodchip vessels under charter.

8. However, for the reasons set forth below, CFI is now winding down its operations.

9. <u>Corporate Structure</u>. CFI is a privately held company and the wholly owned subsidiary of Cogent Biomass, Inc. ("<u>Biomass</u>"), a holding company organized under Canadian law. Together, Donald R. McClure and Robert M. Mantrop indirectly hold a majority of Biomass's stock through holding companies. Though CFI was originally organized as "Cogent Fibre, LLC," a Delaware limited liability company, effective January 1, 2011, Cogent Fibre, LLC changed its name to "Cogent Fibre Inc." and federally incorporated pursuant to the laws of Canada (Corporation No. 773428-0 and Business No. 829577402RC0001) and extra-provincially registered in Ontario (Ontario Corporation No. 1840833).[3] Nevertheless, since CFI's founding its primary management team and headquarters have been located at its registered place of business: 338 Davenport Road, Suite 102, Toronto, Ontario M5R 1K6 Canada (the "<u>Head Office</u>"). In addition to its Head Office in Toronto, CFI has "offices" in Stamford, Connecticut and Istanbul, Turkey. However, these "offices" are merely places where directors and/or independent contractors who worked with CFI lived or were physically located for a time.

10. CFI has two directors: Donald R. McClure and Robert M. Mantrop. Both Mr. McClure and Mr. Mantrop are Canadian citizens and residents. CFI does not have any employees; however, CFI hired two independent contractors to perform certain administrative and back-office functions.

11. <u>Debt Structure</u>. CFI's sole source of financing is its parent company, Biomass. Biomass periodically funded CFI's operations on a secured basis.

B. **The Arbitration and Confirmation Proceeding**

12. <u>The NSU Dispute</u>. In 2007, CFI entered the NSU Charter Party for the use of the Daishin Maru to transport woodchips to CFI's overseas customers. During the performance of

---

[3] CFI was reorganized under Canadian law in order to take advantage of a certain tax treaty by and between the U.S. and Canada.

-4-

the NSU Charter Party, numerous disputes arose between CFI and NSU. Nevertheless, after the parties negotiated certain amendments to the NSU Charter Party, CFI continued to perform thereunder despite the fact that CFI's customers dramatically scaled back demand for woodchips during and after the "financial crisis" in 2008-2009. Those amendments adjusted the freight rates CFI was paying to NSU, which CFI was in turn charging its customers.

13. In September 2011, NSU unilaterally "dry docked"[4] the Daishin Maru without CFI's consent (which consent was required under the NSU Charter Party). One month later, in October 2011, the Daishin Maru departed "dry dock" and NSU requested that CFI provide the next "consecutive cargo"[5] for the Vessel. However, at that time CFI was reviewing its shipping program and could not yet commit to provide such cargo, and instead, CFI requested that the freight rates under the NSU Charter Party be further amended, as the parties had previously done on an annual basis after the 2008 financial crisis to allow for further performance under the NSU Charter Party. Furthermore, CFI requested that NSU seek alternate employment to mitigate any damages as CFI could not provide the Daishin Maru with cargo before the parties adjusted the freight rates under the NSU Charter Party. Nevertheless, the Daishin Maru docked at CFI's loading port and waited for cargo that CFI could not reasonably provide without the requested freight-rate adjustments. NSU then "withdrew" the Daishin Maru from service and terminated the NSU Charter Party.

14. However, after NSU's withdrawal and termination, NSU chartered the Daishin Maru to CFI's competitors—Coretrade and Ecowood—who had obtained woodchips from CFI's

---

[4] "Dry docking" means removing the ship from CFI's service and entering the ship into a shipyard where the ship would be removed from the sea, placed in a dry docking area, and drained of sea water to allow for repairs.

[5] "Consecutive cargo" means that, when in service to CFI under the NSU Charter Party, cargo would be assigned to the Daishin Maru for loading after the prior cargo had been completely discharged and it was in route to the next loading port declared by CFI.

exclusive Venezuelan source. CFI later learned that Coretrade chartered the Daishin Maru to ship <u>CFI's</u> woodchips to one of <u>CFI's</u> core customers in Turkey. CFI believes that this interference with CFI's exclusive supply contract with its Venezuelan source and its economic interest in the Turkish customer resulted in substantial economic losses. Nevertheless, NSU permitted the Daishin Maru to make the shipment.

15. <u>The Arbitration</u>. In February 2012, NSU commenced an arbitration proceeding in New York (the "<u>Arbitration</u>") alleging breaches of the NSU Charter Party, and the parties appointed two arbitrators, Manfred Arnold (NSU's appointee) and Jack Berg (CFI's appointee), who in turn, appointed a third arbitrator/chairman, David Martowski (collectively, the "<u>Arbitration Panel</u>" or the "<u>Panel</u>").

16. NSU asserted a breach claim seeking damages in the amount of US$13,780,297. CFI asserted counterclaims for breach, economic advantage, and tortious interference with contract against NSU and sought damages in the amount of US$15,285,951. The Arbitration lasted three years and comprised 10 evidentiary hearings, multiple discovery disputes, substantial motion practice, and multiple rounds of briefing. On January 23, 2015, the Arbitration Panel issued its findings. Though certain members of the Panel found that both parties breached the NSU Charter Party, an award was entered in NSU's favor in the amount of US$11,606,421 (the "<u>Arbitration Award</u>").

17. <u>The Confirmation Proceeding</u>. In March 2015, NSU commenced a proceeding for confirmation and enforcement of the Arbitration Award by filing its *Petition to Recognize and Enforce Arbitration* [S.D.N.Y.; No. 15-cv-01784-PAE; D.I. 1] in the United States District Court for the Southern District of New York (the "<u>District Court</u>") styled *NS United Kaiun Kaisha, Ltd. v. Cogent Fibre Inc.* (the "<u>Confirmation Proceeding</u>"). In April 2015, CFI filed its

opposition to NSU's petition and cross moved to vacate the Arbitration Award on the grounds that the Arbitration Panel exceeded its authority with respect to the quantum of damages awarded to NSU.

18. On July 14, 2015, the District Court issued that certain opinion and order confirming the Arbitration Award and denying CFI's cross-motion to vacate [S.D.N.Y.; No. 15-cv-01784-PAE; D.I. 15] (the "Confirmation Order"). Although the Petitioner is informed that CFI has 30 days to appeal the Confirmation Order, on July 16, 2015, the District Court entered a judgment (the "Judgment") and closed the Confirmation Proceeding. CFI believes that NSU will expeditiously seek to record the Judgment and proceed with collection actions.

### C.    Events and Circumstances Contributing to the Debtor's Insolvency

19. In the wake of the financial crisis, demand for CFI's fiber-based products among its core customers steadily receded. Due to depressed demand for its products, CFI necessarily shipped less product, which meant less "cargoes" for the Vessels. As a result, disputes arose between CFI and the Vessel owners—NSU and NYK. CFI believes that its disputes with NSU resulted in a loss of as much as US$15.3 million in earnings. In addition, in 2012, NSU commenced the Arbitration seeking damages of US$13.7 million in connection with CFI's alleged breaches of the NSU Charter Party. In January 2015, the Arbitration Panel entered the Arbitration Award in NSU's favor, which has since been confirmed by the District Court. Then, NYK asserted claims against CFI in the amount of US$2.7 million in connection with CFI's alleged failure to ship a certain minimum amount of product. On December 23, 2014, NYK commenced an arbitration proceeding against CFI in New York. CFI has engaged in settlement discussions with NYK, however, the parties have not yet been able to resolve their disputes.

20. The NSU and NYK disputes have greatly exacerbated CFI's financial and

operational difficulties. These disputes compromised CFI's standing in the shipping market, which constrained its ability to charter vessels to deliver its product. Consequently, CFI struggled to meet already-reduced customer demand. Under the weight of declining demand, complex maritime arbitrations, various shipping disputes, and a hostile charter market, CFI's management exercised its reasonable business judgment to begin to wind down CFI's business.

### D.   The Canadian Proceeding

21.   On July 15, 2015, CFI commenced insolvency proceedings under Canada's *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3) (the "BIA"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), File No. 31-2016058 (the "Canadian Proceeding") by filing a Notice of Intention to Make a Proposal (the "NOI"). The Canadian Court entered an Order (the "BIA Order"), among other things, (i) appointing the Petitioner as CFI's duly authorized foreign representative[6] and (ii) authorizing the Petitioner to file the Verified Petition in this Court. In addition, The Fuller Landau Group Inc. will serve as the Debtor's proposal trustee (the "Proposal Trustee").

22.   The Canadian Proceeding was initiated in order to allow CFI to take advantage of the BIA's proposal process. The Petitioner is informed that the BIA proposal process is a collective, streamlined insolvency proceeding wherein CFI—under the Canadian Court's supervision—will attempt to address its liabilities by agreement, or else face liquidation. The Petitioner is also informed that the BIA—like the Bankruptcy Code—includes a number of statutory protections designed to preserve creditors' rights, maximize the value of CFI's property, and achieve an equitable distribution of such property. For example, the Petitioner is informed that (i) upon the filing of the NOI, the BIA automatically imposed a broad stay of

---

[6]   On July 15, 2015, CFI's board of directors passed a resolution duly authorizing the Petitioner to serve as CFI's foreign representative as defined under the Bankruptcy Code.

-8-

proceedings against CFI and its property as well as its officers and directors in order to preserve the value of CFI's remaining assets and (ii) CFI's creditors are entitled to file proofs of claim in the Canadian Proceeding and otherwise may seek to be heard by the Canadian Court in connection therewith. In addition, the Petitioner is informed that—unlike the "cram down" procedure provided under the Bankruptcy Code—the BIA does not allow courts to approve proposals over the objection of an unsecured creditor class that did not vote in favor of the proposal. Finally, the Petitioner is informed that if the BIA proposal process is ultimately unsuccessful, CFI will be liquidated under the BIA's liquidation provisions.

23. Through the Canadian Proceeding, CFI seeks to engage its creditors in order to negotiate a global resolution of all claims and liabilities. In CFI's judgment, a BIA proposal process is the most efficient, cost-effective insolvency proceeding available under Canadian law.

E. **CFI's Center of Main Interests**

24. I am informed that a United States court may apply a factor analysis to determine the center of CFI's main interests, including, among other things: the location of CFI's headquarters, the location of CFI's management, the location of CFI's primary assets, and the location of CFI's "nerve center." According, the Petitioner submits that the following contacts demonstrate that CFI's center of main interests is Ontario, Canada:

- CFI is federally incorporated in Canada and extra-provincially registered in Ontario;

- CFI's Head Office is located in Ontario, Canada;

- All strategic business decisions concerning CFI are made at, or otherwise issue from, its Head Office, including decisions related to the Canadian Proceeding, this chapter 15 case, and all financial and operational matters;

- CFI's directors (and co-founders) are Canadian citizens and residents;

- CFI's marketing materials, including its website, identify CFI as a Canadian company;

- CFI held all of its board meetings in Toronto (at least twice each year, more times if required);

- CFI's parent company—and sole source of financing—Biomass, is organized and registered in Ontario, Canada;

- CFI files its tax returns with, and pays tax on its profits to, the Canada Revenue Agency;

- CFI's books and records are held in Ontario, Canada, including all of CFI's data and servers;

- CFI's primary provider of legal-services is based in Ontario, Canada; and

- CFI's primary bank accounts are maintained in Ontario, Canada.

25. Further, while CFI once had U.S. operations and some related business relationships with U.S. counterparties, <u>all</u> of its known creditors are non-U.S. companies: NSU (Japan), NYK (Japan), Biomass (Canada), and the Canada Revenue Agency.

F.  **CFI's United States Assets**

26. CFI's only assets within the territorial jurisdiction of the United States that the Petitioner is currently aware of are (i) a bank account held at Wells Fargo Bank in White Plains, New York and (ii) an interest in certain funds held in Dentons US LLP's client trust account in New York, New York to secure its services in connection with this chapter 15 case.

G.  **The Relief Requested**

27. <u>The Verified Petition</u>. The purpose of this chapter 15 proceeding is to facilitate a global resolution of CFI's liabilities through the BIA's proposal process. In order to do so, the Petitioner filed the Verified Petition seeking an order (i) recognizing the Petitioner as the "foreign representative" of CFI, (ii) recognizing the Canadian Proceeding as a "foreign main proceeding" or, in the alternative, a "foreign non-main proceeding," and (iii) granting related

-10-

relief. Most of CFI's creditors are located beyond the jurisdiction of the Canadian Court. Indeed, CFI's largest creditors—NSU and NYK—are currently pursuing arbitration and arbitration-related proceedings against CFI in New York. The relief requested in the Verified Petition seeks to channel such creditors to the Canadian Proceeding in order to maximize the value of CFI's remaining assets and ensure the orderly administration of the BIA proposal process.

28. <u>The Stay Motion</u>. In addition to the Verified Petition, the Petitioner filed the Stay Motion seeking (i) an *ex parte* emergency order temporarily staying the commencement or continuation of any and all actions and proceedings against CFI and its property within the territorial jurisdiction of the United States—to the full extent of the automatic stay under section 362 of the Bankruptcy Code, and (ii) after expedited notice and a hearing, an order continuing such relief pursuant to section 1519 of the Bankruptcy Code. The Stay Motion is critical to the success of this chapter 15 case and CFI's proposal process under the BIA. The BIA proposal process will allow CFI to efficiently address its liabilities for the benefit of its estate and its creditors. However, in the absence of the relief requested in the Stay Motion, CFI may be subject to piecemeal litigation and enforcement actions outside the jurisdiction of the Canadian Court (indeed, NSU and NYK have already taken such actions). As mentioned above, NSU and NYK are able to pursue certain of their respective legal remedies against CFI and its assets through arbitration and arbitration-related proceedings in New York (which potentially includes the immediate recordation of the Judgment) and therefore, may not choose to participate in the Canadian Proceeding. Such actions will force CFI to incur additional defense costs thereby further depleting its estate and will likely result in an inequitable distribution (if any) of its remaining assets. Further, CFI's directors (Robert Mantrop and Donald McClure) would be

spread too thin if forced to mount a defense in New York arbitration and collection proceedings while attempting to conduct a BIA proposal process in Canada.

29. By the Stay Motion, CFI seeks to maintain the status quo and facilitate the orderly administration of the Canadian Proceeding pending the Court's consideration of the Verified Petition. In light of the foregoing, the relief sought is urgently needed to prevent immediate, irreparable harm to CFI, its creditors, and other parties in interest.

30. The Petitioner has not previously requested the relief sought by the Stay Motion from this or any other Court.

[*signature on following page*]

Executed this 17th day of July 2015 in Ontario, Canada.

        COGENT FIBRE INC., in its capacity as the Debtor's duly authorized foreign representative

        _____
        Name: Robert M. Mantrop
        Title: Director

84336718